# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

MARILYN J. SMITH,          )
              Plaintiff,       )
                           )
      v.                  )      CAUSE NO.: 2:09-CV-101-PRC
                           )
COMMISSIONER OF      )
SOCIAL SECURITY,       )
              Defendant.    )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Marilyn Smith on November 19, 2009, and a Memorandum in Support of Motion for Summary Judgment or Remand [DE 17], filed by Plaintiff on November 19, 2009. Plaintiff requests that the June 21, 2007 decision of the Administrative Law Judge to deny her disability insurance benefits be reversed or, alternatively, remanded for further proceedings. For the following reasons, the Court grants the request, reverses the decision of the Administrative Law Judge, and remands for further proceedings.

## PROCEDURAL BACKGROUND

Plaintiff filed an application for Disability Insurance Benefits ("DIB") on November 19, 2003, and for Supplemental Security Income ("SSI") on October 20, 2003, alleging an onset date of March 1, 2002. Plaintiff's applications were denied initially and on reconsideration, and a request for hearing was timely filed. On September 29, 2005, Plaintiff appeared and testified at a hearing before Administrative Law Judge Paul R. Armstrong ("ALJ"). She was represented by Attorney James Balanoff. Dr. Daniel Girzadas testified as a medical expert, and Edward Pagella testified as a vocational expert.

On December 1, 2005, the ALJ issued an unfavorable decision denying benefits. Plaintiff then filed a Request for Review of the hearing. On May 9, 2006, the Appeals Council issued an

order remanding the ALJ's decision. Plaintiff appeared before ALJ Armstrong for a second hearing on December 12, 2006, at which Dr. Carl G. Leigh testified as a medical expert, and Michelle Peters appeared and testified as a vocational expert. On June 21, 2007, ALJ Armstrong again denied the request for benefits, making the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2007.

2. The claimant has not engaged in substantial gainful activity since March 1, 2002, the alleged onset date (20 CFR 404.1520(b), 404.1571 et seq., 416.920(b) and 416.971 et seq.).

3. The medical evidence establishes that the claimant has hypertensive cardiovascular disease, diabetes mellitus, asthma, degenerative disc disease, arthritis, and obesity. These medically determinable impairments cause significant limitations in the claimant's work related functioning and are, therefore, severe within the meaning of the Regulations (20 CFR 404.1520(c) and 416.920(c)).

4. Based on objective medical evidence in the record, the DDS reviewers (Exhibit 8F) and the Medical Expert who testified at the hearing, I conclude that the claimant does not have an impairment or combination of impairments that meet or medically equal the requirements of any listed impairment in Appendix 1, Subpart P, Regulations No. 4, specifically when considered under Listing(s) 1.02, 1.04, 3.03, and 9.08 (20 CFR 404.1520(d), 404.1526, 416.920(d), 416.925 and 416.926). Additionally, when considered in conjunction with her other impairments the claimant's obesity does not satisfy the requirements of any listed impairment.

5. After careful consideration of the entire record, I find that the evidence of record as a whole supports a finding that the claimant retains the residual functional capacity to perform the exertional and nonexertional requirements of work, except for that more exertionally demanding than sedentary work, lifting and/or carrying no more than 10 pounds, standing and/or walking for at least 2 hours in an 8 hour workday, and sitting for approximately [ ] 6 hours in an 8 hour workday. Other limitations include: no work at unprotected heights, around dangerous moving machinery, or open flames and bodies of water; no concentrated exposure to noxious fumes or other respiratory irritants.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on August 24, 1958 and was 43 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  The claimant has acquired work skills from past relevant work (20 CFR 404.1568 and 416.968).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, the claimant could do other unskilled jobs existing in significant numbers in the national economy (20 CFR 404.1560(c), 404.1566, 404.1568(d), 416.960(c), 416.966, and 416.968(d)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from March 1, 2002 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 19-26).  Plaintiff filed a Request for Review of the new decision, but on February 9, 2009, the Appeals Council affirmed the ALJ decision,  making the ALJ's decision the final decision of the Commissioner.

On April 14, 2009, Plaintiff filed the instant civil action for judicial review of the Commissioner's final decision.  Plaintiff filed her opening brief on November 19, 2009.  The Commissioner filed a response on February 3, 2010, and Plaintiff filed a reply on February 17, 2010.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case.  Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## FACTUAL BACKGROUND

### A.  Background

Plaintiff was 49 years old at the time of the ALJ's decision and had a high school education. She had past relevant work experience as a sales clerk, a store manager, and a mail carrier.

### B.  Medical Evidence

Plaintiff has a history of asthma, but her lungs were clear upon examination in 2001 and she denied shortness of breath at an examination in 2002.  In December 2002, nearly nine months after Plaintiff's alleged disability onset date, she reported that she was "very busy" and "doing a lot of shopping." (R. 262).

 An x-ray of the lumbosacral spine on June 20, 2000, revealed a somewhat accentuated lumbar lordotic curvature with no other significant findings.  On July 3, 2000, a CT scan predating Plaintiff's onset revealed, at levels L3-L4, facet joints showing a minimal degree of hypertrophic degenerative osteoarthritic changes but was otherwise normal.  A May 2004 chest CT scan revealed a normal heart and lungs.  A subsequent CT scan was conducted on June 17, 2004, which showed normal heights for all lumbar vertebral bodies and normal lordotic curvature but which revealed a moderate degree of hypertrophic degenerative osteoarthritic changes of the facet joints at levels L3-L4 and L4-L5, described as slightly progressive since the study in 2000.

Regarding Plaintiff's diabetes, January 2003 treatment notes reflect that her blood sugars were under "much better control" despite Plaintiff's refusal to take insulin. (R. 238).

Plaintiff underwent a consultative examination at the request of the state agency on December 19, 2003; she reported low back pain and shortness of breath.  Examination was essentially unremarkable and revealed good corrected vision in both eyes, strong pulses and normal

sensation, negative straight leg raising, no significant tenderness or muscle spasm, excellent (5/5) strength in her arms, legs, and hands, and no difficulty getting on and off the examination table, tandem walking, and walking on heels and toes. Plaintiff had mild difficulty hopping and declined to attempt squatting.

A June 2, 2004 x-ray of Plaintiff's left hip found mild degenerative changes with mild narrowing of the osteophyte formation arising from the lateral aspect of the acetabulum. CT scans on June 17, 2004, showed a moderate degree of hypertrophic degenerative osteoarthritic changes for the right hip and mild hypertrophic degenerative osteoarthritic changes for the left hip. Finally, June 2004 diagnostic testing of Plaintiff's legs showed no occlusive disease and no evidence of deep vein thrombosis.

A consultative examination was performed in September 2004 by Teofilo Bautista, M.D. at the request of the state agency. At that time, Plaintiff was 5'11" and weighed 288 pounds. Plaintiff complained primarily of back pain that traveled into her left leg and reported a history of diabetes, hypertension, and asthma; she denied blurry vision and reported that she could lift 30 pounds and independently perform her daily activities. Upon examination, Plaintiff's lungs were clear without wheezes or rales, and she exhibited good bilateral manual dexterity and strength. Plaintiff complained of tenderness in her left hip and low back and refused to attempt range of motion testing on her back and hips. There was no tenderness in Plaintiff's right hip or knees and no swelling or cyanosis in any joint. Plaintiff walked with difficulty without her cane, favoring her left leg, and was unable to squat or walk on heels and toes. Strength was excellent in Plaintiff's arms and right leg and only minimally reduced (4/5) in her left leg; sensation and reflexes were intact.

On September 28, 2004, state agency physician M. Ruiz, M.D./MAR reviewed Dr. Bautista's report and Plaintiff's other medical records and completed a Physical Residual Functional Capacity Assessment, opining that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, and sit or stand and walk for approximately six hours each in an eight-hour workday. He further opined that Plaintiff could only occasionally perform postural movements such as balancing, stooping, and crouching.

During a March 2005 initial examination, Mahendra A. Patel, M.D. noted "minimal" swelling in Plaintiff's legs and tenderness in Plaintiff's lumbar spine and knees. An April 2005 pulmonary function test ordered by Dr. Patel revealed mild chest restriction and cardiac testing was normal. Plaintiff denied shortness of breath in May 2005 but reported knee stiffness and pain; she informed Dr. Patel that she did not check her blood sugars at home because she could not afford the glucometer.

Spirometry pulmonary testing dated April 9, 2005, revealed "mild chest restriction." (R. 455).

Dr. Patel completed a Medical Assessment of Ability to Do Work-Related Activities (Physical) dated May 12, 2005, wherein he found that Plaintiff was limited to standing and walking due to severe knee pain to 30 minutes or less and no standing without interruption. Sitting was limited by arthritis to thirty minutes or less, and she could not sit without interruption. Postural activities were precluded due to severe arthritis. Under the category "Are the following Physical Functions affected by the patient's condition?", the functions of reaching, handling, feeling, pushing/pulling, seeing, hearing, speaking" are listed, and Dr. Patel wrote "none at all." (R. 356). He opined that she was to avoid exposure to environmental irritants due to asthma, wheezing, and

shortness of breath. She required a cane for walking and balancing. He opined that she could do "no work at all." (R. 357).

Plaintiff's treating chiropractor, Joseph Kolanko, D.O., submitted a Medical Assessment of Ability to Do Work-Related Activities (Physical) dated May17, 2005. He opined that Plaintiff could occasionally lift ten pounds, frequently lift five pounds, and stand or walk for no more than an hour total in an eight-hour workday. He also opined that Plaintiff could sit for no more than 30 minutes at a time and that she could never climb, balance, stoop, crouch, or crawl; he further restricted Plaintiff from reaching, pushing, or pulling and from work at heights or around moving machinery. Dr. Kolanko noted, "Due to the patient's spinal instability and facet syndrome symptoms plus being overweight all combined to allow this person to be totally disabled as far as normal activities and work habits." (R. 352). Dr. Kolanko reported that his opinions were based on "CT scan of lumbar spine," "patient history," and orthopedic examination and evaluation. There are no treatment notes in the record from Dr. Kolanko.

On August 10, 2005, Plaintiff reported back pain and stiffness in the morning and tingling in her legs; Dr. Patel noted lumbar tenderness and swelling in Plaintiff's knees. Dr. Patel wrote a note that Plaintiff has non-insulin dependent diabetes mellitus, arthritis, lumbar disc, and hypertension and that she is "totally disabled & unable to work." (R. 450).

In September 2005, Plaintiff's primary complaint was a headache and dizziness; Dr. Patel noted that Plaintiff needed a blood work-up and an MRI, but that she did not have insurance. Plaintiff saw Dr. Patel on October 11, 2005, for painful knees. On April 19, 2006, Plaintiff complained of headaches and dizziness, and told Dr. Patel that she was not taking her blood pressure medication because she could not afford it. On May 24, 2006, Plaintiff complained of blurred

vision. Dr. Patel advised Plaintiff to go on insulin. She refused to go for blood work, as she had no insurance and no money. He advised her to go on Supplemental Security Income or Medicaid so she could have insurance.

On May 22, 2006, on a "Medical Form" for the North Township Trustee in Lake County Indiana, Dr. Patel gave a diagnosis of diabetic retinopathy, insulin dependent diabetes mellitus, blurred vision, and uncontrolled hypertension. He opined that Plaintiff had a permanent disability and cannot perform work responsibilities, recommending her for Medicaid and Supplemental Security Income. On June 29, 2006, Dr. Patel filled out a "Determination of Medicaid Disability: Medical Information" form, opining that Plaintiff is unable to work; he completed a form indicating that she had significant limitations of her ability to perform every work-related activity, including sitting, grasping, and fine manipulation

Plaintiff's August 2006 health history shows that she was taking insulin for her diabetes. Dr. Patel treated Plaintiff in September and October 2006 for an apparent sinus infection.

On December 7, 2006, Dr. Patel filled out a second Medical Assessment of Ability to Do Work-Related Activities (Physical) and opined, as before, that Plaintiff could occasionally lift less than 20 pounds, frequently lift less than 10 pounds and never climb, balance, stoop, crouch, crawl, or kneel. Where the form asked how long Plaintiff could stand and walk or sit without interruption, Dr. Patel again wrote "not at all," and Dr. Patel also opined that Plaintiff could not reach, handle, feel, push, pull, see, hear, or speak "at all." (R. 480). Dr. Patel concluded that Plaintiff was "totally and permanently disabled" and could perform "no work at all." (R. 481).

A January 8, 2007 evaluation by Dr. Patel revealed limited range of motion, muscle spasm, positive straight leg with "sciatica," and diminishd sensation bilaterally at L5-S1. An EMG

conducted for hip, leg, and foot pain on January 8, 2007, provided, "In patients with diabetes mellitus, this study is consistent with diabetic polyneuropathy (DPN) characterized by mild nerve conduction abnormalities." (R. 527).

On March 5, 2007, Plaintiff's attorney submitted the records of treating physician Kishand Chand, M.D., to the ALJ, along with additional records from Dr. Patel and Southeastern Medical Centers. All of Dr. Chand's records referenced in that letter are contained in the record before this Court. January 2007 nerve conduction studies of Plaintiff's legs showed mild diabetic polyneuropathy. Dr. Chand, who appears to have ordered the nerve conduction studies, examined Plaintiff on January 29, 2007; he noted tenderness and reduced range of motion in Plaintiff's lumbar spine and diagnosed her with lumbar strain and radiculopathy. There is also an unsigned treatment note dated February 19, 2007, which Plaintiff attributes to Dr. Chand. On that date, Plaintiff complained of right hip pain but admitted that she had not been attending physical therapy on a regular basis and attributed her low back pain to lack of exercise. Examination findings included mild tenderness, decreased range of lumbar and right hip motion, and some muscle spasm. Although it is not contained within the record, the ALJ summarized a Medical Assessment of Ability to Do Work-Related Activities by Dr. Chand dated March 7, 2007. The ALJ reports that Dr. Chand opined that the maximum amount of weight the claimant can lift and/or carry in an 8-hour workday is less than 10 pounds and that the longest the claimant can stand/walk in an 8-hour workday is 2 hours, along with other non-exertional limitations.

### C. Hearing Testimony

During the hearing, medical expert Carl Leigh, M.D., testified that, after reviewing Plaintiff's medical records, he had concluded that she had mild asthma, diabetes, low back pain, and arthritis

in her hip.  He opined that her combined impairments would limit her to sedentary exertion work that required only occasional foot controls on the left side, occasional postural movements such as crouching and stooping, and did not require concentrated exposure to environmental irritants like dust, gas, and fumes.

Plaintiff testified that she was disabled due to asthma, which caused shortness of breath, diabetes, blurry vision, and low back, knee, and hip pain. She reported using a TENS electrical stimulus unit on her back two or three times daily and lying down often throughout the day.  She stated that her condition had worsened since 2003 and that she had to put a portable toilet in her room because she could not otherwise get to the bathroom quickly enough.  Plaintiff reported that when she first stopped working at Auto Zone in 2002, she was babysitting for her three youngest grandchildren every day for approximately seven hours a day.  However, she could no longer do so in July or August 2005 because she could not bend over to pick them up or lift them.  Plaintiff also cared for her bed-ridden father until March 2006, when she placed him in a nursing home because she reached a point where she could not carry a breakfast tray to him from the kitchen to his bedroom.  She also could no longer empty his portable toilet, which weighed three pounds.  She feared he would fall in the home and that she would not be able to help him up.  In response to detailed questioning by the ALJ, Plaintiff testified that she had difficulty climbing more than a couple stairs, balancing, stooping, crouching, or crawling.  She testified that she requires a cane when she stands and that she cannot stand up without using something solid with which to push herself up.  She testified that she would need to use her cane to arise from a seated position in a cashier-type setting.  She testified to taking insulin 70/30, "Nemrazole" 200mg, Zocor, and the TENS Unit, and that the medications and her high blood pressure make her feel "really, really

incoherent" and "drowsy, sleep." (R. 669). She testified that her husband does all of the cooking and cleaning, which she formerly did.

Plaintiff's son, Lavalle Jackson, testified that his mother used to watch his children and take clothing up and down the stairs to wash but that she could no longer do the wash because she could not navigate the ten steps to the basement. He testified that Plaintiff's husband does the washing and cooking. He also testified that she is a very organized person but has become forgetful and tired and can only accomplish one task per day. He and his brothers help out around the house. He testified that his mother spends a lot of time lying down.

Before posing any hypotheticals, the ALJ asked Vocational Expert ("VE") Michelle Peters: "Ms. Peters, you are going to testify in accordance with the information contained in the Dictionary of Occupational Titles or the Characteristics of Occupations. If there is a difference between your testimony and the informational sources [INAUDIBLE]?" (R. 680). Ms. Peters responded, "Correct." *Id.* Ms. Peters testified that Plaintiff's past relevant work included retail store manager positions, which were skilled and light exertion, and a mail sorter position, which was semi-skilled and medium exertion according to the Dictionary of Occupational Titles ("DOT") and as performed. VE Peters testified that these jobs had skills transferable to two jobs of semi-skilled cashiering, citing DOT codes 211.462-022 and 211.362-010. The ALJ asked her whether there were any jobs that could be performed by an individual with Plaintiff's age, education, and work experience who could perform sedentary work that allowed alternating between sitting and standing and required only occasional foot controls, no work at unprotected heights or around dangerous machinery, no climbing ladders, kneeling, crawling or stooping to floor level, and no more than occasional stair climbing, bending, and balancing. VE Peters testified that such an individual had skills that would

transfer to approximately 2,000 cashier positions in Northwest Indiana and that the cashiering jobs could still be performed with the use of a cane for standing and balance.  She testified that other sedentary jobs with a sit/stand option for a person who had symptoms interfering with concentration, which would limit the person to simple, unskilled work, existed, including approximately 1500 assembly positions and 900 packaging positions.  The VE testified that all jobs would be precluded in response to the ALJ's question of whether significant interference with concentration resulting from side effects from medication or from pain would affect Plaintiff's performance of unskilled, simple jobs for 15 minutes of each hour.

### D.  Post-hearing Consultative Examination

Following the hearing, due to the relative lack of recent medical evidence, the ALJ sent Plaintiff for a consultative examination on March 14, 2007.  Wassim Atassi, M.D. noted that Plaintiff's main complaint was back pain, dating back to 2000.  Examination findings included clear lungs without wheezing or crackling; no obvious joint deformities or problems with her back; normal range of motion in Plaintiff's arms and hands with normal grip strength and manipulation; normal range of motion in the lumbar spine with only a mild amount of pain; acceptable range of motion in the knees and hips, limited only by body habitus; normal strength in her legs; and a wide-based gait due to obesity.  Dr. Atassi also reviewed prior records and noted that a CT scan of Plaintiff's spine showed minimal degenerative changes without stenosis and no obstructive disease on pulmonary function testing; there were no signs of diabetic complications.  He noted that she thinks she has very severe pain but that his exam showed normal range of motion and  the "amount of pain I noted was very mild when moving . . . ."  (R. 538).  He noted that she sat for more than twenty minutes during the interview without noticeable back pain.  He opined that she could lift

thirty pounds occasionally and twenty pounds frequently. He opined that she could stand and/or walk for at least two hours out of an 8-hour work day.

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and under the correct legal standard. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). If an error of law is committed by the Commissioner, then the "court must reverse the decision

regardless of the volume of evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

An ALJ must articulate, at a minimum, his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001) . The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (quoting *Scott*, 297 F.3d at 595); *see also Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent her from doing her previous work, but considering her age, education, and work experience, it must also prevent her from engaging in any other type of substantial gainful activity that exists in significant

numbers in the economy.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The steps are:  (1) Is the claimant engaged in substantial gainful activity?  If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to Step 2; (2) Does the claimant have an impairment or combination of impairments that are severe?  If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to Step 3; (3) Does the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to Step 4; (4) Can the claimant do the claimant's past relevant work?  If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to Step 5; (5) Can the claimant perform other work given the claimant's residual functional capacity ("RFC"), age, education, and experience?  If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At the fourth and fifth steps, the ALJ must consider an assessment of the claimant's residual functional capacity ("RFC").  "The RFC is an assessment of what work-related activities the claimant can perform despite [his] limitations."  *Young*, 362 F.3d at 1000.  The ALJ must assess the RFC based on all the relevant evidence of record.  *Id*. at 1001 (citing 20 C.F.R. § 404.1545(a)(1)).  The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ.  *Id*. at 1000; *see also Zurawski*, 245 F.3d at 886; *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

# ANALYSIS

## A. RFC Finding

Plaintiff argues that the ALJ made an erroneous and conclusory RFC finding by ignoring evidence and improperly weighing the evidence and that the RFC finding is contrary to Social Security Ruling 96-8p. The Commissioner responds that the finding is supported by substantial evidence.

> An ALJ must give the medical opinion of a treating doctor controlling weight as long as the
>
> treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record . . . . When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons . . . for the weight we give to your treating source's opinion.

20 C.F.R. § 404.1527(d)(2); *see also* 20 C.F.R. § 416.927(d)(2); *Schaaf v. Astrue*, — F.3d —, —, 2010 WL 1643665, at *5 (7th Cir. Apr. 26, 2010); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008); *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); SSR 96-8p; SSR 96-2p. The referenced factors listed in paragraphs (d)(2)(i) through (d)(6) are the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, specialization, and other factors such as the familiarity of a medical source with the case. 20 C.F.R. §§ 404.1527(d), 416.927(d).

Courts have acknowledged that a treating physician is likely to develop a rapport with his or her patient and may be more likely to assist that patient in obtaining benefits. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). An ALJ is entitled to discount the medical opinion of a treating physician if it is inconsistent with the opinion of a consulting physician or when the treating

physician's opinion is internally inconsistent, as long as the ALJ is able to "minimally articulate his reasons for crediting or rejecting evidence of disability." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Clifford*, 227 F.3d at 871; *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001); quoting *Clifford*, 227 F.3d at 870). If the ALJ makes a reasoned choice between disparate medical findings, it is beyond the capacity of the Court to review because of the deference afforded the ALJ's decisions. *Gaylor v. Astrue*, 292 F. App'x 506, 512 (7th Cir. 2008). It is the ALJ's responsibility to weigh conflicting evidence and make a determination on disability, and the ALJ has a responsibility to confront the evidence in Plaintiff's favor and explain why it is not persuasive. *Id.* at 512, 513.

In this case, the ALJ addressed the early medical opinions of the two state agency medical consultants Dr. Ruiz and Dr. Bautista, treating physician Dr. Patel, treating physician Dr. Chand, and medical expert Dr. Leigh. However, he characterized Dr. Patel and Dr. Chand as consultative examiners and did not reference treating chiropractor Dr. Kolenko, whose opinion was similar to those of Dr. Patel and Dr. Chand. Plaintiff argues that both Dr. Patel and Dr. Kolanko rendered opinions of her physical restrictions, which, if adopted, would rule out work, and that the ALJ did not properly weigh their opinions.

Prior to addressing the medical opinions, the ALJ reviewed medical evidence of each of Plaintiff's severe impairments. The ALJ summarized in some detail the essentially unremarkable clinical findings through 2004 regarding Plaintiff's asthma, vision, degenerative disc disease, arthritis, and hypertensive cardiovascular disease and found that there is no evidence to establish that the impairments render her totally disabled.

The ALJ first discussed the opinion of treating physician Dr. Patel but erroneously characterized him as a "consultative physician." (R. 24). The ALJ did not reference Dr. Patel's treating notes or history, which began in the spring of 2005, noting only the May 12, 2005, and December 7, 2006 Medical Assessments. He discounted the overall opinion because Dr. Patel "opined that Plaintiff could not even perform the requirements of sedentary work." (R. 24). The ALJ then gave Dr. Patel's opinion no significant weight because it is "not well supported by the other substantial medical evidence of record." *Id.* By failing to identify him as a treating physician, the ALJ apparently did not consider the factors applied when a treating source's opinion is not given controlling weight. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d). Thus, the ALJ did not build an accurate and logical bridge nor did he give "good reasons" for rejecting the opinion. *See id.*

Although not argued by Plaintiff, the ALJ also referred to Dr. Chand as a "consultative physician," (R. 24), whereas Plaintiff identifies him as a treating physician and treatment records from 2007 are contained in the administrative record. As with Dr. Patel, the ALJ summarily gives no significant weight to the opinion of Dr. Chand on the basis that the ALJ does not concur with the opinion because "the doctor's opinion is without substantial support from the other evidence of record, which obviously renders it less persuasive." (R. 24-25). Again, the ALJ does not address any of the factors for a treating physician's opinion and does not give "good reasons" for rejecting the opinion.

Plaintiff correctly notes that the ALJ did not even mention, let alone consider and weigh, the opinion of treating chiropractor Dr. Kolanko. A chiropractor is an "other source," as defined in 20 C.F.R. § 404.1513(d) as well as SSR 06-3p, such that the ALJ should have considered Dr. Kolanko's opinion in formulating the RFC. Social Security Ruling 06-3p provides that, while "other sources"

cannot establish the existence of a medically determinable impairment, information from such "other sources" may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function. SSR 06-3p. Although the Commissioner is correct that the ALJ addressed Dr. Kolanko's opinions unfavorably in 2005 in his first decision, the ALJ failed to do so in the instant decision, and, thus the Court cannot know what impact Dr. Kolanko's opinion had on the ALJ's most recent findings. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) (reasoning that the Commissioner is barred from advancing grounds in support of the decision that were not given by the ALJ). Notably, Dr. Kolanko's opinion is consistent with those of treating physicians Dr. Patel and Dr. Chand, and Dr. Chand's 2007 opinion post-dates the ALJ's 2005 opinion. The Commissioner also argues that Dr. Kolanko's opinion is entitled to little or no weight because there are no treatment records from Dr. Kolanko and, thus, no objective medical support for his assessment of Plaintiff's limitations. The Regulations provide that the Commissioner will consider all relevant evidence in the record, which includes "other medical sources," like chiropractors, and there is nothing in the decision to suggest that the ALJ did so with respect to Dr. Kolanko. *See* 20 C.F.R. § 404.1527(b).

Adding to the lack of analysis, the ALJ primarily relies on the testimony of Dr. Leigh, the medical expert who testified at the hearing, to support his finding of not disabled, but completely ignored the March 14, 2007 post-hearing report of consultative examiner Dr. Atassi whose opinion was sought in light of the disparity between the opinions of treating physician Dr. Patel and Dr. Leigh and appears to support the ALJ's decision.

Finally, the Court notes that the Medical Assessment of Ability to Do Work-Related Activities dated March 7, 2007, which the ALJ attributes to Dr. Chand, is not contained within the

record. Plaintiff argues that the incomplete record is a grounds for reversal. Because the Court reverses and remands on other grounds, the Court orders that, on remand, the Commissioner locate the report relied on by the ALJ and ensure that it is included in the record.

## B. Credibility Finding

Plaintiff contends that the ALJ's credibility finding is vague, erroneous, and not supported by substantial evidence and that the ALJ ignored Social Security Ruling 96-7p and 20 C.F.R. § 404.1529.

An ALJ is in the best position to observe witnesses and to make an appropriate evaluation as to their credibility. *Skarbek*, 390 F.3d at 504. Thus, a reviewing court will not reverse an ALJ's credibility determination unless it is "patently wrong." *Schmidt*, 496 F.3d at 843 (quoting *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003)). In making a credibility determination, Social Security Ruling 96-7p provides that the ALJ must consider the record as a whole, including objective medical evidence; the claimant's statements about symptoms; any statements or other information provided by treating or examining physicians and other persons about the conditions and how they affect the claimant; and any other relevant evidence. *See* SSR 96-7p.

When there is objective medical evidence that could reasonably be expected to produce pain, an ALJ must consider a claimant's subjective complaint in light of such evidence. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008); *see also Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (citing *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)); 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). An ALJ is not required to give full credit to every statement of pain made by the claimant or to find that a disability exists each time a claimant states that he or she is unable to work, and a lack of objective evidence is one factor to be considered by the ALJ. *See Rucker v. Chater*,

92 F.3d 492, 496 (7th Cir. 1996) (quoting *Pope v. Shalala*, 998 F.2d 473, 486 (7th Cir. 1993)) (internal quotations omitted); s*ee also* 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); SSR 96-7p at *6 (providing that a claimant's statements regarding the intensity or persistence of her symptoms "may not be disregarded solely because they are not substantiated by objective medical evidence"); *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) (discussing through secondary sources the complexity of pain and the difficulty of understanding its etiology in the context of an ALJ evaluating claimant testimony based on "objective" evidence); *Schmidt*, 395 F.3d at 746-47 (recognizing that an ALJ cannot disbelieve a claimant's testimony solely because it conflicts with the objective medical evidence). However, despite the inherent difficulty of evaluating such testimony, an administrative law judge will often have solid grounds for disbelieving a claimant who testifies that she has continuous, agonizing pain. *See Johnson*, 449 F.3d at 806. For example, discrepancies between the "degree of pain" reported by a claimant and that suggested by medical evidence "is probative of exaggeration." *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) (citing *Powers v. Apfel*, 207 F.3d 431, 435-36 (7th Cir. 2000)); *see also Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008) (recognizing that "discrepancies between objective evidence and self-reports may suggest symptom exaggeration").

Factors to be considered by an ALJ evaluating a claimant's complaint of pain or symptoms in addition to objective medical evidence include:

(i)     The claimant's daily activities;
(ii)    The location, duration, frequency, and intensity of the claimant's pain or other symptoms;
(iii)   Factors that precipitate and aggravate the symptoms;
(iv)    The type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms;
(v)     Treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms;

(vi)    Any measures other than treatment the claimant uses or has used to relieve pain or other symptoms (*e.g.*, lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(vii)    Any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96-7p at *3.

In this case, the ALJ's credibility determination is based solely on the statements Plaintiff made in the Disability Report dated November 13, 2003, and the Reconsideration Disability Report from March 24, 2004. The ALJ then states that he "made every reasonable effort to obtain available information that could shed light on the credibility of the claimant's statements regarding the nature and severity of her impairment" as to the seven categories set forth in the regulations. Without any analysis of that information or the factors, the ALJ concluded, "I find that while the claimant undoubtedly may experience some pain, limitations, and restrictions from her impairments, the medical record in its entirety demonstrates that the claimant has no greater limitations in her ability to perform work activities than those reflected in the residual functional capacity reached in this decision." (R. 23). He then summarized the medical evidence of record through 2004, as noted above in Part A, to conclude that "the objective medical evidence does not fully support and is not consistent with the claimant's subjective complaints." *Id.*

The ALJ erred by discussing only the brief written statements of Plaintiff on her applications for disability benefits, both of which preceded Plaintiff's first hearing by over two and a half years. The ALJ wholly ignores Plaintiff's hearing testimony and that of her son. There is no discussion of Plaintiff's daily activities, even though the ALJ acknowledges that Plaintiff has a condition that would reasonably cause pain and other symptoms. Consistent with their positions on the disability

determination, the parties interpret the hearing testimony to either support the credibility determination or to undermine it.

Plaintiff testified at the hearing that her condition has worsened since the onset date, which is near the date of the reports upon which the ALJ relied.   Plaintiff identifies testimony regarding her use of a TENS Unit for 30 minutes at a time, three to five times a day; that her condition had worsened since 2003 and she had to put a portable toilet in her room because she could not make it to the bathroom; that by July 2005 she could no longer bend or lift her grandchildren; that she stopped caring for her father because she could not carry his breakfast tray, could not empty his portable toilet, and was afraid that if he fell, she would not be able to help him; that she used a cane when she stood but could not stand up without using something solid to push herself up; that her medications make her drowsy; and that her husband does all the cooking and cleaning, which she used to do.  As with all of her testimony, the ALJ did not mention her complaint regarding the side effects of her medication.   Because the ALJ did not address any of the hearing testimony in his decision, it is not clear whether the ALJ considered the testimony or how he weighed it under SSR 96-7.  *See Indoranto*, 374 F.3d at 474 ("Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected.") (citing *Kasarsky*, 335 F.3d at 543; *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003)).

### C.  Step 4 and Alternate Step 5 Findings

Plaintiff argues that both the Step 4 and Step 5 findings are erroneous because the decision lacks Social Security Ruling 00-4p authentication and because the jobs identified by the VE have skills in excess of those identified from Plaintiff's previous related work.

Ruling 00-4p requires that an ALJ who receives testimony regarding the requirements of a particular job inquire of the VE about any possible conflict between the testimony and the DOT. *See* SSR 00-4p; *Prochaska*, 454 F.3d at 735. To the extent that there is a conflict, SSR 00-4p requires the ALJ to obtain an explanation if the conflict between the testimony and the DOT is "apparent." *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (citing *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008)). When, as in this case, Plaintiff failed to identify any conflict at the hearing, Plaintiff must demonstrate that the conflict was "obvious enough that the ALJ should have picked up on [it] without any assistance." *Overman*, 546 F.3d at 463.

In this case, the ALJ asked VE Peters at the outset of her testimony, "Ms. Peters, you are going to testify in accordance with the information contained in the Dictionary of Occupational Titles or the Characteristics of Occupations. If there is a difference between your testimony and the informational sources [INAUDIBLE]?" to which Ms. Peters responded, "Correct."(R. 680). In the Court's view, the ALJ's premature question does not satisfy the requirement that an ALJ must ask a VE if the evidence she provided conflicts with information provided in the DOT. The Ruling requires "a reasonable explanation" as to an apparent conflict "[i]f the VE's or VS's evidence appears to conflict with the DOT . . . ." SSR 00-4p at *4. The requirement is not an onerous one, it only asks for a simple verification. However, questioning a VE as to the consistency of her testimony before she testifies is problematic. Prior to the testimony, the VE has not heard the hypothetical(s) that will be posed and has not been questioned by the Plaintiff or Plaintiff's counsel. Thus, at that point she is uncertain what her testimony will be. The Ruling provides that the ALJ is to "[a]sk the VE . . . if the evidence he or she has *provided* conflicts with . . . the DOT." SSR 00-4p at *4 (emphasis added). The use of the past tense suggests that the ALJ is to question the VE

about the consistency of her testimony with the DOT after she gives her substantive testimony. Moreover, the case law requires the ALJ to inquire into the conflict when it is "apparent," which could not be determined until the testimony is taken. On remand, the ALJ should question the VE as to the consistency of her testimony with the DOT after the VE testifies.

Plaintiff also argues that there is an actual conflict between the jobs and the DOT because the jobs identified by the VE had skills beyond that which she testified were transferable. However, Plaintiff offers no support in her argument for this assertion. The cash register jobs identified by the ALJ, 211.462-022 and 211.362-010 are both sedentary jobs and neither requires any of the other limitations in the RFC–"no work at unprotected heights, around dangerous moving machinery, or open flames and bodies of water; no concentrated exposure to noxious fumes or other respiratory irritants." (R. 21). The ALJ did not include a limitation on concentration in his RFC, which the vocational expert testified would have ruled out the semi-skilled cashiering jobs. But, the vocational expert also testified that even if those jobs were eliminated, there were still approximately 1500 assembly positions and 900 packaging positions that Plaintiff could perform. Plaintiff has not argued that these jobs are beyond her skill level and has not identified any apparent conflicts between these jobs and the DOT. Finally, Plaintiff argues that the DOT description of the cashier jobs have an SVP of 4 and 5, far above those two job skills identified in the ALJ's decision. Although Plaintiff does not pursue this issue in her reply brief, any such inconsistency should be addressed on remand, if appropriate.

## CONCLUSION

Based on the foregoing, the Court **GRANTS** the Memorandum in Support of Motion for Summary Judgment or Remand [DE 17]. The decision of the ALJ is **REVERSED** and **REMANDED** for further proceedings consistent with this Order.

Although the Court disagrees with Plaintiff's statement that the "tone of the administrative law judge's opinion and review of the transcript . . . suggest that ALJ Armstrong may have an unshakable commitment to the denial of Plaintiff's claim," Pl. Br., p. 18, because this case was previously assigned to ALJ Armstrong prior to a remand from the Appeals Council, the Court **ORDERS** that the case be assigned to a different administrative law judge pursuant to HALLEX I-2-1-55.

So ORDERED this 6th day of May, 2010.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc: All counsel of record